# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

|  |  |
|---|---|
| DAVID WELLS,                                    )<br>                                                         )<br>                            Plaintiff,         )<br>            vs.                                      )<br>                                                         )<br>GLOBAL TECH INDUSTRIES, *et al.*,   )<br>                                                         )<br>                            Defendants.    )<br>_____) | Case No.: 2:21-cv-02040-GMN-NJK<br><br>**ORDER** |

Pending before the Court is Defendant Liberty StockTransfer, Inc's ("Defendant's") Motion for Summary Judgment, (ECF No. 52). Plaintiff David Wells ("Plaintiff") filed a Response, (ECF No. 64), to which Defendant filed a Reply, (ECF No. 65).

Also pending before the Court is Plaintiff's Motion for Summary Judgment, (ECF No. 55). Defendant filed a Response, (ECF No. 63), to which Plaintiff filed a Reply,[1] (ECF No. 66).

Further pending before the Court is Defendant's Motion for Sanctions, (ECF No. 51). Plaintiff filed a Response, (ECF No. 57), to which Defendant filed a Reply, (ECF No. 60).

For the reasons discussed below, the Court GRANTS Plaintiff's Motion for Summary Judgment, and DENIES Defendant's Motion for Summary Judgment and Motion for Sanctions.

///

///

///

---

[1] Plaintiff also filed a list of Evidentiary Objections to Defendant Liberty Stock Transfer, Inc's Materials in Opposition to Motion for Summary Judgment. (ECF No. 66-1). The Court considers Plaintiff's objections but finds that they do not impact the Court's determination of the parties cross-motion for summary judgment for the reasons set forth below.

## I.     **BACKGROUND**

This case arises from Defendant's alleged failure to register and transfer Plaintiff's shares of stock.  Formerly known as Tree Top Industries, Inc., Global Tech Industries Inc. ("GTII") is a corporation organized under the laws of the State of Nevada, with a registered address in Las Vegas, Nevada. (Compl. ¶ 2, ECF No. 1).  Defendant is the current stock transfer agent of GTII. (*Id*. ¶ 3).  Plaintiff is a financial consultant who performed services for GTII in 2012. (*Id*. ¶ 8).

On February 6, 2012, Plaintiff received 1,500,000 fully paid and non-assessable shares of GTII common stock as partial payment for prior services rendered. (*Id*.); (Jeffrey English ("English") Decl. ¶ 2, ECF No. 54).  This transaction was confirmed in GTII's 10-Q Form filed with the United States Securities and Exchange Commission ("SEC") on May 10, 2012.[2] (SEC 10-Q Form at 12, Ex. 2 to Pl.'s Mot. Summ. J. ("MSJ"), ECF No. 55-3).  GTII allegedly issued a certificate for these shares, Certificate Number ZQ.6713 (the "Certificate"), (Certificate at 1, Ex. 1 to English Decl., ECF No. 54), but the record shows that GTII never delivered Plaintiff a physical stock certificate memorializing his ownership of the shares. (David Wells ("Wells") Decl. ¶ 5, Ex. 9 to Plaintiff's MSJ, ECF No. 55-11); (David Reichman ("Reichman") Dep. 76:12–21, Ex. 2 to Teri T. Pham ("Pham") Decl. to Ex. 10 to Pl.'s MSJ, ECF No. 55-21).

On December 28, 2012, GTII's board effected a 100 to 1 reverse stock split, and Plaintiff's shares were converted from 1,500,000 to 15,000 shares of common stock. (English Decl. ¶ 4).  GTII again did not issue or deliver a physical stock certificate to Plaintiff.  Instead, Direct Transfer LLC, a subsidiary of Issuer Direct Corporation ("Issuer Direct"), and GTII's transfer agent at the time, registered Plaintiff as the owner of 15,000 uncertificated shares held

---

[2] Fed. R. Evid. 201 permits a court to take judicial notice of "matters of public record outside the pleadings." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998).  "It is . . . 'well-established that courts may take judicial notice of SEC filings,' which are matters of public record." *Fluor Corporation v. Resolute Management, Inc.*, No. 8:21-cv-01907, 2022 WL 2101891, at *2 (C.D. Cal. May 4, 2022) (citation omitted).  Accordingly, the Court takes judicial notice of GTII's SEC filings.

in book entry form. (SEC 10-K Form at 16, Ex. 3 to Pl.'s MSJ, ECF No. 55-4).  GTII's shareholder list corroborated that Plaintiff's shares were uncertificated. (English Dep. 40:16–41:23, Ex. 3 to Pham Decl. Ex. 10 to Pl.'s MSJ, ECF No. 55-25).

On March 21, 2016, David Reichman, GTII's president, sent an email to Issuer Direct requesting a copy of GTII's shareholder list. (*See generally* Reichman Email at 1, Ex. 1 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-12).  Specifically, Reichman sought a list of what shares were listed as "book entry, noted as [f]ree, or [r]estricted." (*Id*. at 2, Ex. 1 to Wells Decl. to Ex. 9 to Pl.'s MSJ).  In response, Issuer Direct sent a document which showed Plaintiff as the owner of 15,000 shares of book entry stock. (List of Certificates at 5, Ex. 2 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-13).  On March 22, 2016, Plaintiff and Reichman discussed this document in an email exchange, during which Reichman noted without objection that Plaintiff's shares were held in book entry form. (Wells & Reichman 2016 Email Exchange at 2–3, Ex. 2 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-13).

On May 10, 2016, GTII conducted a 10 to 1 forward split of shares, which converted Plaintiff's 15,000 shares to 150,000 shares. (SEC 10-Q Form at 20, Ex. 4 to Pl.'s MSJ, ECF No. 55-5).  Specifically, Plaintiff's 150,000 shares were recorded as his initial 15,000 book entry shares plus an additional 135,000 shares issued in book entry form.  Once again, GTII did not issue or deliver any physical stock certificate to Plaintiff.  Indeed, Olde Monmouth, the transfer agent which followed Issuer Direct but preceded Defendant, listed in its records that Plaintiff owned 150,000 uncertificated book entry shares. (English Dep. 41:19–42:4, Ex. 3 to Pham Decl. to Ex. 10 to Pl.'s MSJ, ECF No. 55-25); (Old Monmouth Records January 24, 2020, at 43, Ex. 1 to Resp. Mot. Sanctions, ECF No. 57-2).  Until July 30, 2021, after Defendant became GTII's transfer agent, Plaintiff was noted in GTII and Defendant's records as separately owning 15,000 and 135,000 shares in book entry form. (Account Entry at 1–4, Ex. 4 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-15).

On August 6, 2021, Plaintiff sent a letter to the law firm of Foley Shechter Ablovatsky LLP ("Foley") and Defendant requesting that Defendant register his 150,000 shares of GTII stock. (August 6, 2021, Letter at 2, Ex. 5 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-16). This same day, Reichman emailed Plaintiff stating that GTII had the Certificate in its possession. (Wells & Reichman 2021 Email Exchange at 1, Ex. E to English Decl., ECF No. 54-6).  Reichman explained that GTII was withholding the Certificate because Plaintiff purportedly failed to fulfill the original consultancy agreement in 2012 by which he earned the GTII shares underlying this lawsuit. (*Id.*, Ex. E to English Decl.).  On August 7, 2021, Foley sent its Rule 144 Opinion Letter to Defendant. (Rule 144 Opinion Letter at 2, Ex. 6 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-17).  Defendant maintains that at some time prior to August 2021, it was made aware that GTII had records showing that Plaintiff's original 15,000 shares were recorded in book entry form when they were held in certificate form. (English Dep. 64:1– 65:9, Ex. 1 to Pl.'s Reply, ECF No. 66-3); (English Dep. 78:1–79:21, Ex. B to Anthony J. D'Artiglio ("D'Artiglio") Decl., ECF No. 53-2).  However, the record shows that Defendant was informed of this alleged discrepancy on August 9, 2021, through a letter sent by the Law Office of Michael Bruk ("Bruk").  (August 9, 2021, Letter at 12, Ex. B to Def.'s Resp., ECF No. 63-1).  Specifically, the letter stated that,

> By way of example, there is a book entry dated December 28, 2012, for David Wells in the amount of 15,000 shares (BE1-515), and another book entry dated May 09, 2016, in the amount of 135,000 shares (BE1-516). However, the Company is in possession of the attached certificate in the name of David Wells for 1,5000,000 shares (Certificate Number ZQ.6713) issued by VStock Transfer LLC.  As you know, GTII performed a 1-for-100 reverse split on December 28, 2012, and a 1-for-10 forward split on May 09, 2016.  Thus, while Mr. Wells' total amount of shares (150,000) is correct, the shares being in book entry is incorrect.  In other words, since Mr. Wells' certificate was never presented for conversion to book entry, all of Mr. Wells' holdings should be in certificate form only.

(*Id.*, Ex. B to Def.'s Resp.).

1    Because of this alleged discrepancy, Defendant asserts that Plaintiff was required under

2    Nevada law to provide the Certificate to register and transfer his 15,000 certificated shares.

3    (Def.'s MSJ 2:15–18, ECF No. 52).

4    On August 17, 2021, GTII filed a Complaint against Plaintiff in the United States

5    District Court for the Southern District of New York. (*See generally* GTII Complaint, Ex. 5 to

6    Pl.'s MSJ, ECF No. 55-5).  That same day, Jeffrey English, Defendant's president, emailed

7    Plaintiff, explaining that GTII issued a "strop transfer order" against his shares because of

8    GTII's contention that Plaintiff's "original shares [were] not [in] book-entry form . . . ."

9    (August 17, 2021, Email Exchange at 2, Ex. G to English Decl., ECF No. 54-8).  English

10   further explained that Defendant would re-evaluate Plaintiff's request once the Southern

11   District of New York declined to impose an "injunction or [temporary restraining order]." (*Id.*,

12   Ex. G to English Decl.).  English articulated that "in the event the dispute is resolved," it would

13   need an "updated legal opinion . . ., a medallion guaranteed stock power/DWAC Request Form

14   and transfer fees of $275" to process Plaintiff's request. (*Id.*, Ex. G to English Decl.).  Notably,

15   GTII did not file a motion for injunctive relief in the Southern District of New York until April

16   25, 2022, nearly eight months after Plaintiff made his first request seeking registration of his

17   shares. (*See generally* Order Denying Injunctive Relief, Ex. 7 to Pl.'s MSJ, ECF No. 55-8).

18   On August 17, 2021, Plaintiff's counsel sent Defendant a copy of the medallion

19   guaranteed stock power/DWAC Request Form along with the other requirements specified by

20   Defendant. (August 17, 2021, Letter from Plaintiff's Counsel at 1–2, Ex. H to English Decl.,

21   ECF No. 54-9); (DWAC Form at 1, Ex. I to English Decl., ECF No. 54-10).  Defendant

22   maintains that this request was deficient for two reasons: (1) the DWAC Request Form failed to

23   include the Certificate, thereby preventing it from registering the 15,000 shares it contends

24   were certificated, and (2) Plaintiff provided a copy of the DWAC Request Form and medallion

25   signature rather than the original version. (English Decl. ¶¶ 24–27).  Even if Plaintiff complied

with these conditions, Defendant asserts it then would have required Plaintiff to present a broker's representation letter prior to registering his shares. (*Id*. ¶ 20).

On November 11, 2021, Plaintiff filed a Complaint against Defendant in this Court, asserting that Defendant and GTII violated their Duty to Register Transfer of Shares under NRS § 104.8401. (Compl. ¶¶ 21–26).  On April 29, 2022, GTII's motion for injunctive relief was denied, and on July 21, 2022, the Southern District of New York granted Plaintiff's motion to dismiss GTII's complaint with prejudice. (*Id*., Ex. 7 to Pl.'s MSJ); (Order Granting Mot. Dismiss, Ex. 8 to Pl.'s MSJ, ECF No. 55-9).  Defendant subsequently registered 135,000 of Plaintiff's shares, and on June 3, 2022, executed the transfer of those shares.  To date, Defendant has not registered or transferred the 15,000 shares GTII alleges are certificated.

In August 2022, Defendant filed the present Motion for Sanctions and Motion for Summary Judgment. (ECF Nos. 51, 52).  In response, Plaintiff filed his Motion for Summary Judgment (Pl.'s MSJ, ECF No. 55).  The Court discusses the parties cross-motions for summary judgment and Defendant's Motion for Sanctions below.

## II.   <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp*., 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S.

253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

Fed. R. Civ. P. 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  To obtain relief under Rule 56(d), the nonmovant must show "(1) that [he or she] ha[s] set forth in affidavit form the specific facts that [he or she] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential to resist the summary judgment

1    motion." *State of Cal. v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

2    **III.    DISCUSSION**

3         **A. Cross-Motions for Summary Judgment, (ECF Nos. 52, 55)**

4         "[W]hen simultaneous cross-motions for summary judgment on the same claim are

5    before the court," like they are here, "the court must consider the appropriate evidentiary

6    material identified and submitted in support of both motions, and in opposition to both motions,

7    before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,

8    249 F.3d 1132, 1134 (9th Cir. 2001).

9         At its core, the present controversy is composed of four distinct issues.  First, whether

10   Plaintiff breached his 2012 consultancy agreement with GTII, thereby eliminating his

11   ownership interest in the shares he now claims Defendant wrongfully refused to register and

12   transfer.  Second, whether Defendant and GTII are equitably estopped from claiming the

13   original 15,000 shares are certificated.  Third, whether Plaintiff complied with the

14   preconditions required under Nevada law to register and transfer his uncertificated shares on

15   August 17, 2021.  Finally, assuming Defendant wrongfully refused to transfer Plaintiff's shares,

16   the parties dispute what date should be used to measure the value of his shares in calculating

17   damages.

18        The Court will begin by examining whether Plaintiff earned his GTII shares.

19        **1.  Plaintiff's Ownership Over the GTII Shares**

20        Defendant contests for the first time in its Response to Plaintiff's Motion for Summary

21   Judgment that Plaintiff is not entitled to the GTTI shares at issue because he breached his

22   consultancy agreement with GTII in 2012. (Resp. Pl.'s MSJ 3:19–23, ECF No. 63).  In

23   response, Plaintiff contends that Defendant's argument relies on isolated statements taken from

24   the record which fail to create a disputed fact. (Reply Pl.'s MSJ 3:16–4:9, ECF No. No. 66).

25   Additionally, Plaintiff advances that this Court should adopt the reasoning of the Southern

District of New York in finding that Defendant's argument surrounding any alleged contractual dispute is time-barred by the applicable statute of limitation. (*Id.* 4:10–15).

Beginning with Plaintiff's second argument, the Southern District of New York determined in *Global Tech Industries Group Inc. v. Wells*, that any claim by GTII concerning whether Plaintiff breached the 2012 consultancy agreement is time-barred under New York or California's statute of limitation.[3] No. 21-cv-06891, 2022 WL 2872298, at \*6 (S.D.N.Y. July 21, 2022). The Southern District of New York reached this conclusion by examining the oral communications between Plaintiff and GTII that took place in 2012, as well as the shares issued to Plaintiff this same year. *Id.* Using 2012 as the operative date based on these events, the court then determined that because GTII's case was initiated in 2021, nearly nine years after the cause of action accrued, any claim for breach of contract or breach of the implied covenant of good faith and fair dealing was time-barred under New York or California's statute of limitation. *Id.*

Here, any dispute surrounding whether Plaintiff earned his GTII shares pursuant to his consultation agreement with GTII arises from the same operative events identified by the Southern District of New York. Under New York law, causes of action for breach of contract and breach of the covenant of good faith and fair dealing are governed by N.Y. C.P.L.R. § 213(2), which provides for a six-year statute of limitations. *See Callahn v. Credit Suisse (USA), Inc.*, No. 10-cv-4599, 2011 4001001, at \*7 (S.D.N.Y. Aug. 18, 2011) ("[T]he statute of limitations on a claim for breach of a duty of the implied covenant of good faith and fair

---

[3] Plaintiff also requests the Court take judicial notice of this order. (*Id.*) "However, judicial notice is not necessary or warranted as to decisions by other courts." *Madera Group, LLC v. Mitsui Sumitomo Insurance USA, Inc.*, 545 F. Supp. 3d 820, 829 (C.D. Cal. 2021). In any event, "such opinions may be considered 'without a party requesting that they may be judicially noticed.'" *Madera Group, LLC*, 545 F. Supp. 3d at 829 (quoting *Lucero v. Wong*, No. 10-cv-1339, 2011 WL 5834963, at \*5 (N.D. Cal. Nov. 21, 2011). Accordingly, Plaintiff's request for judicial notice is DENIED as to this document. The Court nevertheless considers this order and the reasoning therein.

dealing is six years."). In California, a two-year statute of limitations applies to breaches of oral contracts, Cal. Civ. Proc. Code § 339, and a four-year statute of limitations applies to breaches of written contracts, Cal. Civ. Proc. Code § 337. *See In Re Capital Options, L*LC, 719 Fed. App'x 609, 611 (9th Cir. 2018). Finally, in Nevada, claims arising under breach of contract have a six-year statute of limitations. *See* NRS § 11.190(1)(b); *Van Damme v. JP Morgan Chase Bank, Inc. N.A.*, No. 2:15-cv-1951, 2018 WL 1512599, at *5 (D. Nev. Mar. 26, 2018). Regardless of which state's statute of limitation applies, any claim contesting whether Plaintiff breached the 2012 consultancy agreement is time-barred. Accordingly, the Court adopts the reasoning of the Southern District of New York in finding that any dispute concerning whether Plaintiff earned the GTII shares at issue is time-barred.[4]

### 2. Equitable Estoppel

Plaintiff contends that Defendant is equitably estopped from asserting his original 15,000 shares are certificated. (Pl.'s MSJ 12:23–14:15). In response, Defendant asserts that Plaintiff is unable to "establish all the elements of estoppel through undisputed material facts." (Resp. Pl.'s MSJ 15:14–16); (Reply Def.'s MSJ 13:11–15:7). Specifically, Defendant maintains that Plaintiff cannot prove the second, third, and fourth elements of equitable estoppel. (Resp. Pl.'s MSJ 15:14–16); (Reply Def.'s MSJ 13:11–15:7).

"'Equitable estoppel functions to prevent the assertion of legal rights that in equity and

---

[4] Even if any claim surrounding Plaintiff's ownership was not time-barred, it is unclear to the Court how the record supports the inference that Plaintiff is not the rightful owner of the GTII shares at issue. Indeed, GTII and Defendant recognized Plaintiff as the owner of the relevant GTII shares for almost a decade. For example, Plaintiff was included on GTII's shareholder list filed with the SEC. (SEC 10-K Form at 16, Ex. 3 to Pl.'s MSJ). Moreover, Reichman, GTII's president, had a direct conversation with Plaintiff concerning his shares during which he noted without objection that Plaintiff's shares were in book entry form. (Wells & Reichman Email Exchange at 2–3, Ex. 2 to Wells Decl. to Ex. 9 to Pl.'s MSJ). Further, in Defendant's Motion for Summary Judgment, it included in its statement of undisputed facts that "[o]n or about February 6, 2012, Defendant GTII – under its former business name Tree Top Industries, Inc. – issued 1,500,000 shares of common stock at $.0001 par value per share in favor of Plaintiff." (Def.'s MSJ 3:11–15). It would be unfair to allow Defendant and GTII to now contest Plaintiff's ownership of these shares after its recognition without protestation for nearly a decade.

1   good conscience should not be available due to a party's conduct.'" *In re Estate of Prestie*, 138

2   P.3d 520, 525 (Nev. 2006) (quotation omitted).   Equitable estoppel requires that "(1) the party

3   to be estopped must be apprised of the true facts, (2) he must intend that his conduct shall be

4   acted upon, or must so act that the party asserting estoppel has the right to believe it was so

5   intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he

6   must have relied to his detriment on the conduct of the party to be estopped." *In re Harrison*

7   *Living Trust*, 112 P.3d 1058, 1062 (Nev. 2005).   "Whether to apply equitable estoppel is within

8   the court's discretion." *Leeward Capital, L.P. v. Archon Corp.*, 759 F. Supp. 2d 1249, 1254–55.

9   (D. Nev. 2010) (citation omitted).   As stated, the parties do not dispute the first element of a

10  *prima facie* equitable estoppel claim.   Accordingly, the Court's discussion is limited to an

11  examination of the remaining three elements.

12       Beginning with the second element, this case concerns which party is responsible for a

13  recordation error.   According to Defendant, it should not be held liable for GTII, by and

14  through its previous transfer agents' blunder, in recording Plaintiff's shares as book entry rather

15  than certificated.   This argument misses the mark.   One of the "basic principles" of negotiable

16  instrument law is that an "issuer is estopped from denying representations made in the text of a

17  security." Uniform Commercial Code § 8-202 cmt. 2; *see Delaware-New Jersey Ferry Co v.*

18  *Leeds*, 186 A. 913, 286 (Del. Ch. 1936) ("If an innocent purchaser for value cannot rely on the

19  verity of what the complainant itself represented by its certificate to be true, there could be not

20  security whatever in transactions of purchase and sale of stocks.").   Pursuant to this principle,

21  "a defect in form or the invalidity of a security" normally is not "available to the issuer as a

22  defense." Uniform Commercial Code § 8-202 cmt. 2 (citing *First Nat Bank of Fairbanks,*

23  *Alaska v. Alaska Airmotive*, 119 F.2d 267, 269 (9th Cir. 1941).  This "general rule of estoppel is

24  here adopted in favor or purchasers . . . ." (*Id.*).

25       Applying this general rule to the facts of this case, the burden for a recordation error

should be placed on the issuer and it's transfer agent rather than the shareholder. *See In re Bame*, 252 F.R. 148, 156 (D. Bk. Min. 2000) ("Taken as a whole, the unambiguous import of Article 8 is that the issuer of the certificated security bears the risk of improperly issued securities or other defects."). Yet Defendant would have the Court invert this burden. It would have the Court find that Plaintiff is effectively at fault for GTII and Defendant's error.[5] To do so would be manifestly unfair where, as here, GTII represented in its SEC filings and records kept by its transfer agents that Plaintiff's shares were held in book entry form. (SEC 10-K Form at 16, Ex. 3 to Pl.'s MSJ); (List of Certificates at 5, Ex. 2 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-13).

Indeed, on July 30, 2021, a week before Plaintiff requested Defendant to register his shares, Defendant provided Plaintiff with a record showing that his shares were in book entry form. (Account Entry at 1–4, Ex. 4 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-15). In the face of these repeated attestations that Plaintiff's shares were in book entry form, it is not contrary to principles of equity, as Defendant maintains, to bind Defendant and GTII to its representation that Plaintiff's shares were in book entry form.[6] *See Holbrook v. New Jersey Zinc Co.*, 1874 WL 11228, at *4 (N.Y. Jan. 1, 1874) ("It cannot now be denied, that if a corporation having power to issue stock certificates does in fact issue such a certificate, in

---

[5] *See* 2 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary & Law Digest ¶ 8-202[A][3] (2d ed. 1991) ("It was the intention of the drafters to place the burden of complying with the applicable laws governing the issuance of securities upon the issuer rather than the purchase. The basic idea, as between the issuer and purchase, was that it was the issuer's responsibility to see that the securities issued were legally and properly issued. In the event of some defect going to the validity of the security, therefore, the issuer would be estopped from asserting such a defect.").

[6] Defendant supplements its argument by including documentation from GTII dated January 24, 2022, and April 29, 2022, showing that Plaintiff's shares were held in certificate form. (January 24, 2022, Account Statement at 1, Ex. C to English Decl., ECF No. 54-4); (April 29, 2022, Account Statement at 1, Ex. D to English Decl., ECF No. 54-5). The Court considers this evidence but does not find it persuasive. Specifically, this case concerns a dispute whether Plaintiff's shares were held in book entry or certificate form when Plaintiff first made his request in August 2021. That GTII changed its books after Plaintiff's request to reflect its contention that Plaintiff's shares were held in certificate form after this litigation began does not alter the Court's analysis.

which it affirms that a designated person is entitled to a certain number of shares of stock, it thereby holds out to persons who may deal in good faith with the person named in the certificate, that he is an owner and has capacity to transfer the shares. This proposition does not rest on any view of the negotiability of stock but on general principles appertaining to the law of estoppel.").

Turning to the third element, Defendant argues that Plaintiff was not ignorant of the true state of facts because "Plaintiff, before even making a request to [Defendant] to register or transfer the shares, was informed by GTII that the shares are certificated." (Reply Def.'s MSJ 13:20–23); (*see* Resp. Pl.'s MSJ 6:5–23). In support of its argument, Defendant primarily relies on a series of email exchanges between it and Plaintiff following August 16, 2021. (Reply Def.'s MSJ 13:23–14:1); (Resp. Pl.'s MSJ 6:7–23). However, Plaintiff's original request to Defendant to register and transfer his shares was made on August 6, 2021. (August 6, 2021, Letter at 2, Ex. 5 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF No. 55-16). Thus, Defendant's argument fails to the extent that it relies on emails occurring after Plaintiff's request had been made.

Defendant additionally relies on an email exchange between Plaintiff and Reichman that occurred the same day Plaintiff requested Defendant register and transfer his shares. Specifically, on August 6, 2021, Reichman sent Plaintiff an email stating that GTII had Plaintiff's "certificate in its possession." (Wells & Reichman 2021 Email Exchange at 1, Ex. E to English Decl., ECF No. 54-6). Reichman further explained that GTII never "tendered the certificate to you as payment" because Plaintiff purportedly did not fulfill the 2012 consultancy agreement. (*Id.*, Ex. E to English Decl.). Reichman disclosed that GTII "would gladly turn your certificate over" if Plaintiff could resolve the issue which formed the basis of his 2012 consultancy agreement, but "[s]hort of that, you have not earned the compensation." (*Id.*, Ex. E to English Decl.). For the reasons set forth below, the Court finds that this email exchange fails

to defeat Plaintiff's estoppel argument.

Prior to this email GTII, [7] and by extension Reichman, repeatedly represented to Plaintiff that his shares were held in book entry form.  This included a discussion between Reichman and Plaintiff in 2016 during which Reichman noted without objection that Plaintiff's shares were held in book entry form. (Wells & Reichman 2016 Email Exchange at 2–3, Ex. 2 to Wells Decl. to Ex. 9 to Pl.'s MSJ).  Reichman's August 6, 2021, email marks a complete departure from these representations.  Indeed, based on the record before the Court, this email not only constitutes the first instance where GTII, through Reichman, mentions that Plaintiff's shares are certificated, but now introduces the contention that Plaintiff never actually earned his GTII shares.  The Court is unwilling to conclude that this email, sent the same day Plaintiff requested his shares be registered and transferred to Defendant, demonstrates that Plaintiff was not ignorant of the true state of facts. [8]

As to the last element, Defendant asserts that Plaintiff cannot "point to any detrimental by him based on any representation by [Defendant] that the shares were not certificated, particularly because Plaintiff does not state what he would have done differently." (Reply Def.'s MSJ 14:3–12).  Defendant further asserts that "[n]owhere does Plaintiff allege he would have been able to convince [GTII] to provide the Certificate or otherwise take any action to effectuate transfer of certified shares in the absence of a Certificate." (Resp. Pl.'s MSJ 16:17–21).  The Court disagrees.

Beginning with Defendant's latter statement, this argument requests the Court reward misconduct.  At its core, Defendant asserts there can be no detrimental reliance because even

---

[7] The Court separately questions the propriety of Reichman's actions.  Indeed, for the reasons set forth above, any dispute surrounding whether Plaintiff earned his GTII shares is time-barred.  Even assuming that Plaintiff's shares were certificated, GTII, and by extension Reichman, would have a legal obligation to provide Plaintiff with his certificate.  To essentially hold a certificate hostage because of an alleged breach of contract a decade prior is improper.

[8] If anything, this email gives rise to the inference that Reichman emailed Plaintiff concerning the alleged certification of his shares after Plaintiff expressed to Defendant his intent to register and transfer his shares.

assuming Plaintiff's shares were certificated, GTII would have wrongfully refused to provide Plaintiff with the Certificate.  To condone such conduct would encourage issuers to wrongfully withhold certificates, thereby depriving shareholders of their rightful property, to prevent the transfer or sale of shares. *See Hall v. Dichello Distributors, Inc.*, 506 A.2d 1054, 1059 (Conn. App. Ct. 1986) ("This is an unreasonable reading of the two statutes which leads to the bizarre result of allowing Zempsky, by his refusal to deliver the shares of stock to Hall, to thwart the intention of the statutes.").

As to the former, Plaintiff's entire claim is predicated on his reliance on GTII and Defendant's representations that his shares were held in book form.  It is not a question of what Plaintiff would have done differently, but the doubt cast on any transaction he could have engaged in due to GTII and Defendant denying their previous representations that Plaintiff owned book entry shares.  GTII, with its agents including eventually this Defendant, represented for nearly a decade that Plaintiff owned a certain number of shares in a certain form.  These affirmative actions thereby held out to the world that Plaintiff was an owner of a specific type of share with the capacity to transfer his uncertified shares.  If Plaintiff cannot rely on the verity of the representations provided to him by GTII and Defendant, then there can be no security in any transaction he engaged in, including the one underlying the present dispute. *See Delaware-New Jersey Ferry Co.*, 186 A. at 286.

In sum, the Court agrees with Plaintiff's estoppel argument.  Defendant is estopped from contending that Plaintiff's shares were held in certificate form.  Accordingly, Defendant's position that it was not obligated to registration and transfer Plaintiff's shares because it was certificated is untenable.

///

///

///

### 3.  Registration & Transfer of Plaintiff's Uncertified Shares

Having determined that Plaintiff possessed uncertificated shares, the next issue concerns whether Defendant improperly refused to register and transfer said shares.[9]  Article 8 of the Nevada Uniform Commercial Code ("UCC")—Investment Securities governs the registration of transfers of securities by stock issuers and their transfer agents.  Section 8201(a) provides that the issuer is the company that issued the security. NRS § 104.8201(a).  "Nevada, by statute, has made a transfer agent's duty the same as that of the issuing corporation." *Shaw v. Empire Stock Transfer Inc.*, 381 F. Supp. 3d 286, 291 (S.D.N.Y. 2019) ("Moreover, Nevada, by statute, has made a transfer agent's duty the same as that of an issuing corporation.") (citing NRS § 104.807); *see Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 194–95 (Nev. 2014) (observing that NRS § 104.807 "makes a transfer agent's duty the same as an issuing corporation's in performing the statutory functions involved in processing a request to register a transfer of securities").  Thus, Defendant had the same duty as GTII in processing Plaintiff's request to register and transfer his shares.

NRS § 104.8401.1, titled "Duty of Issuer to Register Transfer," provides that if an issuer

---

[9] The Court separately notes that Defendant also argues that GTII's refusal to deliver the "Certificate actually evidences that Plaintiff does not have the right to seek registration or transfer of his shares." (Resp. Pl.'s MSJ 12:17–19).  First, for the reasons set forth above, the Court disagrees with this argument as a matter of law as it would encourage issuers to deprive shareholders of their rightful ownership by improperly withholding certificates to prevent the transfer of shares. *See Western Cab Co. v. Kellar*, 523 P.2d 842, 845 (Nev. 1974) ("To entertain a defense of non-delivery at this late stage would be manifestly unjust and tantamount to permitting the preparation of fraud upon the defendant parties.").

Second, having determined that Plaintiff possesses only uncertified shares, the Court finds that Defendant's non-delivery argument is misplaced.  Plaintiff's uncertified shares were "delivered" as set forth in NRS § 104.8301(2)(a).  Specifically, this provision provides that "[d]elivery of an uncertificated security to a purchaser occurs when . . . [t]he issuer registers the purchaser as the registered owner, upon original issue or registration of transfer."  Here, it is undisputed that GTII registered Plaintiff as the owner of GTII shares both in its filings with the SEC and in the records maintained by Issuer Direct, Olde Monmouth, and Defendant. *See Arnold v. KJD Real Estate, LLC*, 682 Fed. App'x 483, 485 (7th Cir. 2017) ("Rather, a valid transfer occurs only if the stock is delivered to the purchaser. Delivery occurs when the purchaser acquires possession of the stock certificates, or (in the case of an uncertificated stock), when the issuer registers the purchaser as the registered owner."). Accordingly, the entirety of Plaintiff's shares was delivered to him under Nevada law.

is presented "with a request to register transfer or an instruction is presented to an issuer with a

request to register transfer of an uncertificated security, the issuer shall register the transfer"

provided that certain preconditions are met. *Id*. These preconditions include:

> (a) Under the terms of the security, the person seeking registration of transfer is eligible to have the security registered in his or her name;
>
> (b) The endorsement or instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;
>
> (c) Reasonable assurance is given that the endorsement or instruction is genuine and authorized;
>
> (d) Any applicable law relating to the collection of taxes has been complied with;
>
> (e) The transfer does not violate any restriction on transfer imposed by the issuer in accordance with NRS § 104.803.
>
> (f) A demand that the issuer not register transfer has not become effective under NRS 104.8403, or the issuer has complied with subsection 2 of that section but no legal process or indemnity bond is obtained as provided in subsection 4 of that section; and
>
> (g) The transfer is in fact rightful or is to a protected purchaser.

NRS § 104.1(a)–(g). It is the third requirement codified in subsection (c) that is the basis of the

present dispute. Specifically, the parties dispute what constitutes a "reasonable assurance.

Defendant asserts that to "satisfy subsection (c) of NRS § 104.8401(1), an issuer may

request an original medallion signature guarantee and a broker's representation letter." (Def.'s

MSJ 13:13–15:10); Resp. Pl.'s MSJ 18:15–20). In response, Plaintiff argues that Defendant's

requested assurances were unreasonable considering that his identity and ownership of the

shares were undisputed, (Reply Pl.'s Resp. 14:4–15:16).

Here, the Court finds that the original medallion signature and broker's representation

letter required by Defendant were unreasonable assurances. As Defendant notes, a medallion

signature is an important tool used to verify the identity of the owner of stock. (*See* Reply Pl.'s MSJ 18:1–20) (collecting cases).  But here, there was never any dispute as to Plaintiff's ownership of the shares until this litigation began, and Defendant's sole concern about Plaintiff's identity arose from the fact that he "made all of his requests" in "electronic form from the other side of the country." (Resp. Pl.'s MSJ 18:26–28).  This justification hardly warrants the extreme measures imposed by Defendant when there were less stringent means available to verify his identity.  This is especially true when considering that Plaintiff, as the registered owner of the shares, directly issued the instruction to register and transfer his shares. *See* NRS § 104.8306 cmt. 3 ("If the signer purports to be the owner, the guarantor under paragraph (2), warrants only the identity of the signer."); NRS § 104.8402 cmt. 1("Subsection (b) provides that an issuer may require additional assurances if that requirement is reasonable under the circumstances, but if the issuer demands more than reasonable assurance that the instruction or the necessary indorsements are genuine and authorized, the presenter may refuse the demand and sue for improper refusal to register.").  The Court declines to conclude that requiring an original medallion signature and broker's representation letter is categorically unreasonable.  But here, Defendant erected procedural barriers to prevent the transfer of Plaintiff's shares citing concerns over identity and ownership that were non-existent.

In sum, the Court finds the measures imposed by Defendant were unreasonable under the circumstances.  Based on the facts of this case, Defendant's efforts can best be described as an attempt to engage in "procedural subterfuge" to prevent the transfer of Plaintiff's shares. *Merkens v. Computer Concepts Corp.*, 766 F. Supp. 2d 245, 248 (E.D.N.Y. 1999).  As Plaintiff otherwise complied with the requirements of NRS § 104.8401, the Court finds that Defendant wrongfully refused to transfer Plaintiff's shares in violation of NRS § 104.8401.

///

///

### 4.  Damages

Here, Plaintiff argues that any measurement of damages should be calculated using GTII's share prices on August 17, 2021, the day Defendant wrongfully refused to transfer Plaintiff's shares. (Reply Pl.'s MSJ 15:19–11).  In rebuttal, Defendant posits that because NRS § 104.8403 permitted GTII to institute a stop transfer for up to thirty days to obtain an injunction or provide an indemnity bond, Plaintiff's damages should be measured on the day after this period elapsed, specifically September 16, 2021. (Resp. Pl.'s MSJ 23:6–17).

Plaintiff cites to *Source Direct Holdings, Inc. v. Integritas, Inc.*, in support of his argument. No. 2:08-cv-520, 2010 WL 4286272 (D. Utah Oct. 21, 2010); (Reply Pl.'s MSJ 16:1).  In *Source Direct Holdings, Inc.*, the United States District Court for the District of Utah applied Nevada law in measuring a shareholder's damages for an issuer's wrongful refusal to transfer shares. *Id*. at *6.  In determining what day to measure the value of the stock for computing damages, the court began by noting that "the measure of damages in Nevada for the conversion of property, when the converter keeps possession of it, is the fair value of the property at the time of its conversion, plus (prejudgment) interest from the date of conversion." *Id*. at *6 (collecting cases).  This analysis is aligned with Plaintiff's theory that the measure of damages is the value of the stock at the date of conversion.

However, the court then observed that on November 10, 2005, a stop transfer instruction was issued against the plaintiff's shares. *Id*. at *7.  The court found this stop transfer was lawfully imposed against the shares for three days. *Id*.  Thus, the *Source Direct Holdings, Inc*. court determined that under Nevada law, the appropriate date to measure the value of the stock was the day the stop transfer period elapsed. *Id*.  Contrary to Plaintiff's contention, *Source Direct Holdings, Inc*. does not support his theory that the value of his shares should be measured on the initial date of Defendant's refusal.  Instead, it stands for the proposition that the proper date to measure the value of a stock for determining damages is the date when the

1    time period that a party can legally impose a stop transfer on a plaintiff's shares has elapsed.

2         The Court adopts the reasoning of the court in *Source Direct Holdings, Inc*., and applies

3    it to the facts of this case.  As relevant here, NRS § 104.8403 "outlines the procedure for a

4    person demanding that an issuer not issue a transfer of security, generally referred to as a 'stop

5    transfer' notice." *West Coast Stock Transfer, Inc. v. Terra Tech Corp.*, No. 19-cv-745, 2019

6    WL 6998770, at *7 (C.D. Cal. July 23, 2019).  NRS § 104.8403(2)(c) provides that an issuer

7    may institute a stop transfer for a period of time in order to "obtain legal process or an

8    indemnity bond."  *Id.*  NRS § 104.8403(2)(c)(3) in turn states that this period may not "exceed

9    30 days after the date of communication of the notification" that the stop transfer is imposed.

10   *Id*.

11        Here, the parties do not dispute that GTII was legally authorized to impose a stop

12   transfer on Plaintiff's shares for up to thirty days after it instituted legal proceedings against

13   Plaintiff in the Southern District of New York on August 17, 2021. (Resp. Pl.'s MSJ 9:13–16);

14   (Resp. Def.'s MSJ 17:4–24).  During this time, GTII had to request injunctive relief or provide

15   an indemnity bond to prolong the stop transfer. *See Bender v. Memory Metals, Inc.*, 514 A.2d

16   1109, 1118 (Del. Ch. 1986) (noting that the intermediary would have been statutorily required

17   to register the transfer after thirty days under UCC § 8-403, the statute NRS § 104.8403 is

18   based on, if the defendant "never obtained an injunction or furnished the requisite stock").

19   Because it did not do so, GTII's stop transfer elapsed on September 16, 2021.

20        Based on the records provided by Plaintiff, GTII's share price was $1.25 at closing on

21   September 16, 2021. (GTII Share Prices at 2, Ex. 10 to Wells Decl. to Ex. 9 to Pl.'s MSJ, ECF

22   No. 55-21).  Therefore, the total value of Plaintiff's shares as of September 16, 2021, was

23   $187,500.00.  Plaintiff explains he mitigated his damages during the pendency of this lawsuit

24   by selling 135,000 shares for $147,924.00. (Reply Pl.'s MSJ 16:24–26).  Accordingly,

25   subtracting Plaintiff's mitigated damages from the total, Plaintiff is entitled to $39,576.00 in

damages for Defendant's wrongful refusal to transfer his shares.[10]

In sum, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

### B.   Defendant's Motion for Sanctions, (ECF No. 51)

Defendant also filed a Motion for Sanctions under Fed. R. Civ. P. 11.  According to Defendant, sanctions are appropriate because Plaintiff "initiated a frivolous Complaint against [it] for the sole purpose of harassment, delay, and malicious injury." (Mot. Sanctions 2:6–8, ECF No. 51).  "Under Rule 11, sanctions are appropriate if, measured objectively, a motion or paper is frivolous, legally unreasonable, or without factual foundation." *Spellacy v Wells Fargo Bank, N.A.*, No. 8:20-cv-02101, 2021 WL 7285997, at *7 (C.D. Cal. Aug. 4, 2021) (citation omitted).  For the reasons set forth above concerning he parties cross-motions for summary judgment, the Court finds that Plaintiff's arguments were not objectively "frivolous" or "legally unreasonable." *Id*.  Further, Defendant has failed to show that Plaintiff initiated this action for purposes of harassment. *See In re Keegan Mgmt. Co.*, 78 F.3d 431, 436 (9th Cir. 1996) ("For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass.").  Thus, the Court DENIES Defendant's Motion for

---

[10] Because Plaintiff's damages are below $75,000 excluding attorney's fees and costs, or the amount in controversy requirement necessary for a court to exercise diversity jurisdiction, Defendant asserts this Court no longer has jurisdiction over this lawsuit. (Resp. Pl.'s MSJ 23:20–25).  However, the Ninth Circuit has explained that the amount in controversy requirement is determined "at the time the action commences, and a federal court is not divested of jurisdiction . . . if the amount in controversy subsequently drops below the minimum jurisdictional level." *Hill v. Blind Indus. And Servs. of Md.*, 179 F.3d 754, 757 (9th Cir. 1999); *see Hill v. Hill-Love*, 509 F. App'x 605 (9th Cir. 2013) (invoking "this circuit's longstanding rule that the propriety of removal is determined solely on the basis of the pleadings filed in state court" and rejecting the plaintiff's contention that the case should have been remanded to state court based on the plaintiff's "belated attempt to avoid federal jurisdiction" by stipulating to a lower amount in controversy); *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 375 (9th Cir. 1997) ("Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.") (citation omitted).  Accordingly, the Court retains jurisdiction over this matter even if the amount in controversy dropped below the jurisdictional threshold.

Sanctions.[11]

To recount, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment and Motion for Sanctions. Plaintiff is awarded $39,576.00 in damages for Defendant's wrongful refusal to register transfer of shares in violation of NRS § 104.8401. Moreover, Plaintiff is also awarded pre-judgment interest and post-judgment interest at the rate set by the United States Department of Treasury.

## IV.   **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 55), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 52), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Sanctions, (ECF No. 51), is **DENIED**.

**DATED** this __1__ day of March, 2023.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT

---

[11] The Court separately observes that in Plaintiff's Response, he requested that Defendant be sanctioned in the amount of $7,952.20, the cost Plaintiff incurred in responding to Defendant's Motion for Sanctions. (Resp. 15:5–16:2, ECF No. 57). The instant action can only be described as extremely contentious, and neither side has worn a white hat during the pendency of this suit. Accordingly, the Court declines to impose sanctions against either party. The Court warns GTII, however, that if it advances the same meritless arguments set forth by Defendant in a separate motion, the Court will not hesitate to impose sanctions.